**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EPHRAIM TEKLE,<br><br>                Plaintiff,<br><br>     v.<br><br>UNITED STATES OF AMERICA, ET AL.,<br><br>                Defendants. | CV 01-3894-RSWL<br><br>ORDER RE: THE COURT'S FINDINGS OF FACTS AND CONCLUSIONS OF LAW |

On April 14, 2009, the Court and the Jury simultaneously heard Plaintiff's claims brought pursuant to Bivens and the Federal Torts Claims Act ("FTCA"). The trial concluded on April 20, 2009 and the Jury was instructed to decide Plaintiff's Bivens claims.  The FTCA claims were left for the Court to decide.  The Court, having now heard and considered all evidence and arguments set forth in this trial now **FINDS AND RULES AS FOLLOWS:**

The Court finds in favor of Defendant United States of America.  Plaintiff brings his claims under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq*. for (1) Assault, (2) Battery, (3) False Arrest, and (4) Intentional Infliction of

1

Emotional Distress.  The Court finds that Plaintiff has not met his burden to establish these claims.[1]

# I.

## THE COURT'S FINDINGS OF FACTS

1.  In or about March 1998, Solomon and Lily Tekle, Plaintiff's parents, were under investigation by the Internal Revenue Service - Criminal Investigations Division and the Drug Enforcement Administration for suspected narcotics trafficking and tax-related offenses.

2.  As part of the ongoing investigation, Special Agent Thomas Jankowski was responsible for preparing a detailed plan regarding the proper execution of search and arrest warrants on Solomon and Lily Tekle and the Tekle residence located at 19673 Los Alimos Street, Chatsworth, California.

3.  In preparing the plan to serve the search and arrests warrants on Solomon and Lily Tekle and the Tekle residence, Special Agent Jankowski took a number of factors into account, including but not limited to the following: (a) the size of the Tekle residence, which was a large, multi-level home with many windows and exits; (b) the six-foot high iron fence fortifying the Tekle residence; (c) Solomon Tekle, a suspected narcotics trafficker, was the registered owner of a 9 MM semi-automatic handgun; and (d) the nature of the crimes for which Solomon and Lily Tekle were being investigated.  In addition, based on intelligence and surveillance, it was determined that three children, including Plaintiff, resided in the residence, and that Lily Tekle routinely took her children to school each morning.

---

[1]   The Court acknowledges that its Findings of Facts are based heavily on credibility considerations of the witnesses.  Therefore, the Court's Findings of Facts and/or Conclusions of Law should not be construed as binding on a jury if Plaintiff's Biven's claims should proceed to another trial.

4. In preparing the plan to serve the arrest and search warrants, Special Agent Jankowski contemplated the safety of the agents, Solomon Tekle, Lily Tekle, the Tekle children, and any other individuals that might otherwise be present at the time the warrants were served.

5. Among other things, Special Agent Jankowski included special plans intended to minimize the likelihood of the Tekle children being present at the residence during the execution of the warrants. For example, Special Agent Jankowski planned for the arrests of Lily and Solomon Tekle to take place after Lily Tekle had dropped the children off at school, even though this required waiting until 7:00a.m.-8:00 a.m. to execute the search and arrest warrants, and thus posed a greater danger to the agents. As a safety precaution for the children, the plan contemplated the children being out of the house and at school before the parents were arrested.

6. As part of the detailed search and arrest plan, Special Agent Jankowski determined that approximately 20-25 agents would be necessary to safely, effectively and properly execute the search and arrest warrants at the Tekle residence.

7. The approximately 20-25 agents were to be divided into two general groups – the entry team and the cover team. The entry team, divided into several cells, was responsible for making entry into the sizable Tekle residence, arresting Solomon Tekle, securing any other individuals encountered inside the residence and quickly securing the Tekle residence. The cover team was responsible for providing outside cover around the perimeter of the Tekle residence, protecting the entry team against any internal or external threats, including potential gunfire, securing any individuals encountered on the premises, and taking necessary steps to minimize any potential risk to the agents making entry.

8. The agents were to maintain their entry or cover team roles, as assigned, until the "all clear" had been given, or stated alternatively, until Solomon Tekle

1  was arrested and the house had been secured.  Once Solomon Tekle was arrested

2  and the residence was secured, members of both teams were expected to perform

3  their assigned responsibilities in relation to searching the Tekle residence.

4      9.  On the morning of March 23, 1998, following a briefing and staging

5  meeting at a nearby location, and pursuant to the plan devised by Special Agent

6  Jankowski, IRS-CID cover agents deployed around the perimeter of the Tekle

7  residence, while the entry team lined up in their respective cells and prepared to

8  enter the residence, arrest Solomon Tekle and secure the residence.

9      10.  A broadcast was made over a public address system to announce the

10  presence of law enforcement officers, and, at about the same time, Special Agent

11  Jankowski called Solomon Tekle on a cellular telephone, requesting that Mr. Tekle

12  surrender himself at the front door.

13      11.  As the entry team approached the front door of the residence, one of the

14  garage doors opened unexpectedly, and Plaintiff – at the time a large juvenile,

15  approximately 11 years old and 5'2 tall – exited the attached garage.  Plaintiff

16  spotted the agents, stopped and began to reenter the home through the open garage

17  door.

18      12.  At the time Plaintiff appeared, the entry and cover team did not know

19  that the individual exiting the garage was Plaintiff or that Plaintiff had remained at

20  home that morning.  Although Lily Tekle told this information to the agents who

21  arrested her, it was not relayed to the entry and cover team outside the Tekle home.

22      13.  Specifically, Agent Hawkes did not know that Plaintiff was at home or

23  that the unidentified juvenile outside the garage was Plaintiff.

24      14.  Plaintiff's sudden and unexpected presence created a risk to himself and

25  to the agents present at the Tekle residence.  More specifically, Plaintiff had placed

26  himself directly between the line of armed cover agents facing the house and the

27  house itself, which contained a potentially armed suspected narcotics trafficker.  In

28  doing so, Plaintiff had placed himself within an extremely sensitive and dangerous

4

1    zone where he could have been caught in a potential crossfire or caused danger to

2    or interference with the entry team's access into the house.  In addition, his attempt

3    to re-enter the home created the risk of a potential hostage situation.

4          15.  Agent Hawkes was assigned to cover the portion of the house consisting

5    of the garage through which Plaintiff exited.

6          16.  Out of concern for Plaintiff's safety, as well as the safety of the other

7    agents at the scene, Special Agent David Hawkes– in split-second fashion and

8    consistent with his training – promptly assessed the threat and quickly proceeded

9    with generally accepted law enforcement practices and techniques: (1) Special

10   Agent Hawkes verbally ordered Plaintiff to his knees, and Plaintiff obeyed.  (2)

11   An agent opened the gate with a remote device provided by Lily Tekle during her

12   arrest.  (3) Special Agent Hawkes holstered his weapon, walked through the open

13   gate, and approached Plaintiff.  (4) With his weapon holstered, Special Agent

14   Hawkes handcuffed Plaintiff, checked to ensure that the cuffs were not too tight by

15   placing his little finger between Plaintiff's wrist and the cuff, double-locked the

16   cuffs to prevent any tightening of the cuffs, and quickly patted Plaintiff down for

17   weapons. (5)  Special Agent Hawkes then escorted Plaintiff out of danger, through

18   the gate, and handed him off to another agent.

19         17.  At no time did Agent Hawkes ever put a gun to Plaintiff's head.

20         18.  It is not a generally accepted police practices to hold an unholstered

21   weapon while searching or handcuffing a person because it poses a danger of the

22   weapon unintentionally discharging and/or the subject gaining control of the

23   officer's gun.

24         19.  It is also not a generally accepted police practice to hold an unholstered

25   weapon while handcuffing a person because it is nearly impossible to handcuff a

26   person with one hand.

27         20.  It is not a generally accepted police practice to hold a gun to a subject's

28   head because it increases the likelihood of the weapon unintentionally discharging

1   and/or the subject gaining control of the officer's gun.

2       21.  Out of concern for Plaintiff's safety, as well as the safety of Special

3   Agent Hawkes and the other agents at the scene, Special Agent Keith Boden – also

4   in split-second fashion and consistent with his training – provided cover for

5   Plaintiff and Special Agent Hawkes while Special Agent Hawkes was approaching,

6   handcuffing and escorting Plaintiff away from the zone of danger.  In doing so, and

7   consistent with generally accepted law enforcement techniques, Special Agent

8   Boden's weapon was out of its holster and pointed at the house in a low ready

9   position.

10      22.  While Special Agent Hawkes was handcuffing Plaintiff and Special

11  Agent Boden was providing cover for Plaintiff and Special Agent Hawkes,

12  Plaintiff, Special Agent Hawkes and Special Agent Boden were still located in a

13  sensitive and dangerous location between the Tekle residence and the line of armed

14  cover agents with weapons directed toward the residence.  As such, Special Agent

15  Hawkes took action consistent with generally accepted law enforcement techniques

16  that would most efficiently and effectively minimize the threat Plaintiff posed to

17  himself and the other agents present at the Tekle residence.

18      23.  Even after Plaintiff was searched and found not to possess any weapons,

19  Plaintiff still posed a risk to the officers' legitimate execution of the warrants

20  because of his proximity in time and location to the extremely dangerous activity

21  of executing the warrants against a highly dangerous and potentially armed

22  suspect.  Moreover, Plaintiff posed a risk to his own safety if during this critical

23  time he attempted to approach the house or re-enter the premises as he had already

24  once endeavored.

25      24.  In the interim, other agents – including Special Agent Jankowski, one of

26  the team leaders – proceeded to knock at the door.  In response to Jankowski's cell

27  phone call, Plaintiff's father came to the door and was arrested and handcuffed.

28      25.  Once Plaintiff's father was arrested and handcuffed, agents continued

1  with their sweep to secure the residence and within approximately 10-15 minutes,
2  sounded an all-clear.

3      26.  Consistent with generally accepted law enforcement practices and
4  techniques, Plaintiff was immediately released from the handcuffs once the house
5  was secured and declared "all clear."

6      27.  Plaintiff suffered no physical injuries from the handcuffing and never
7  sought any medical attention for any alleged injuries.

8      28.  Plaintiff was handcuffed for no longer than a total of approximately 15-
9  20 minutes.

10     29.  After Plaintiff was released from the handcuffs, Plaintiff was taken to
11 the garage area while the residence was being searched, seated on a stool for a
12 short period of time and then escorted into the house to watch television until
13 family members arrived to take custody of Plaintiff.

14     30.  No weapons were pointed at Plaintiff while he was watching television
15 and waiting for his relatives to take custody of him.

16     31.  Plaintiff's mother, Lily Tekle, requested that the Agents call relatives to
17 take custody of Plaintiff rather than turning him over to Child Protective Services.

18     32.  Although Plaintiff testified that on March 23, 1998 a federal agent
19 ordered him into a prone position prior to being handcuffed, Plaintiff's testimony is
20 not credible on this point and goes against the weight of the evidence presented.

21     33.  Although Plaintiff testified that on March 23, 1998 a federal agent held
22 a gun to his head while he searched and handcuffed him, Plaintiff's testimony is
23 not credible on this point and goes against the weight of evidence presented.

24     34.  Although Plaintiff testified that on March 23, 1998 a federal agent
25 picked him up by the chain on his handcuffs, Plaintiff's testimony is not credible
26 on this point and goes against the weight of the evidence presented.

27     35.  Although Plaintiff testified that on March 23, 1998 a federal agent threw
28 Plaintiff's shoes at him and then spat on his shoes, his testimony is not credible on

7

1  this point and goes against the weight of the evidence presented.

2      36.  Although Plaintiff testified that on March 23, 1998 one or more federal

3  agents held a gun to his head as he sat on the curb and on a stool in front of the

4  garage, Plaintiff's testimony is not credible on this point and goes against the

5  weight of the evidence presented.

6      37.  Although Plaintiff testified that on March 23, 1998 a federal agent made

7  insulting remarks about his parents' country of origin, Plaintiff's testimony is not

8  credible on this point and goes against the weight of the evidence presented.

9      38.  The testimony of Solomon Tekle regarding the alleged conduct of

10  federal agents toward Plaintiff on March 23, 1998 is not credible and goes against

11  the weight of the evidence presented.

12      39.  The testimony presented on behalf of the federal agents is credible, and

13  indicates that any conduct of federal agents toward Plaintiff on March 23, 1998

14  was consistent with generally accepted law enforcement practices and was

15  comprised of techniques that were reasonable, appropriate and justified under the

16  circumstances.

17      40.  From the perspective of a reasonable officer on the scene, handcuffing

18  Plaintiff for approximately 15-20 minutes from the time Plaintiff exited the garage

19  until the Tekle residence was secured, under the circumstances, was consistent with

20  generally accepted law enforcement techniques.

21      41.  From the perspective of a reasonable officer on the scene, on March 23,

22  1998, Plaintiff exited the garage of the Tekle residence at a very crucial, high-risk

23  and sensitive point during the execution of the search and arrest warrants – the

24  moment at which the entry team was proceeding in a single-file line toward the

25  front door of the Tekle residence to arrest Solomon Tekle and secure the Tekle

26  residence.

27      42.  From the perspective of a reasonable officer on the scene, on March 23,

28  1998, Plaintiff unexpectedly appeared and placed himself directly in a zone of

8

danger between the Tekle residence and cover agents armed with weapons positioned at a low-ready, pointed toward the Tekle residence.  From the perspective of a reasonable officer on the scene, pointing weapons in the general direction of Plaintiff was, under the circumstances, consistent with generally accepted law enforcement techniques.

43.  Federal agents learned, in their use of force training, that temporarily detaining the occupants of a residence, even if the detainees are not suspected of committing any crime, is lawful.

44.  When Plaintiff emerged from the residence just as the entry agents were proceeding toward the entrance of the Tekle residence he posed a threat to his own safety as well as the safety of the agents.

45.  Consistent with Special Agent Hawkes' training, and in consideration of the legitimate law enforcement interests at issue – for example, minimizing the risk of harm to the officers and facilitating the orderly completion of the search – Special Agent Hawkes handcuffed Plaintiff for the 15-20 minute period until the Tekle residence was secured, after which time the handcuffs were immediately removed.

46.  Following service of the search and arrest warrants on March 23, 1998, both of Plaintiff's parents were arrested and charged with narcotics trafficking, tax evasion and other offenses.

47.  Plaintiff's parents stood trial together in 1999.

48.  Plaintiff attended the trial of his parents every day, and did not attend school during that five to six-week period.

49.  Plaintiff's father was convicted of multiple charges including heroin trafficking and income tax counts and is currently serving a federal sentence of more than 360 months.

50.  Despite an unsuccessful appeal, Plaintiff's father maintains his innocence to this day.

51.  Plaintiff's father maintains to Plaintiff that he is innocent and that police officers presented false testimony against him.

52.  Plaintiff's mother was convicted of lesser charges and served a sentence of approximately 1 year in federal prison.  During the sentencing of Lily Tekle, the trial judge found that she made a false statement under oath.

53.  Plaintiff's mother has not talked with Plaintiff about why his father is incarcerated.

54.  Subsequent to the arrest of Plaintiff's mother and the forfeiture of their large home in Chatsworth, California, Plaintiff, his mother and sisters moved to an apartment in Northridge, California.

55.  While Plaintiff's mother was incarcerated, Plaintiff's grandmother resided at the Northridge apartment with Plaintiff and his sisters. After serving her federal sentence, Plaintiff's mother returned to live at the Northridge apartment with Plaintiff and his sisters.

56.  Testimony on Plaintiff's behalf that the conduct of federal agents on March 23, 1998 caused Plaintiff to develop post traumatic stress disorder is not credible and goes against the weight of the evidence.

57.  Testimony on Plaintiff's behalf that the conduct of federal agents on March 23, 1998 caused Plaintiff to develop severe depression is not credible and goes against the weight of the evidence.

58.  Testimony on Plaintiff's behalf that the conduct of federal agents on March 23, 1998 continually causes Plaintiff to suffer from post traumatic stress disorder and severe depression is not credible and goes against the weight of the evidence.

59.  Testimony on Plaintiff's behalf that the conduct of federal agents on March 23, 1998 caused Plaintiff to drop out of school is not credible and goes against the weight of the evidence.

60.  Testimony on Plaintiff's behalf that the conduct of federal agents on

March 23, 1998 is the cause of Plaintiff current unemployment is not credible and goes against the weight of the evidence.

61.  Testimony on Plaintiff's behalf that Plaintiff will need psychiatric care for the rest of his life as a result of the conduct of federal agents on March 23, 1998 is not credible and goes against the weight of the evidence.

62.  Testimony on Plaintiff's behalf that Plaintiff has become an alcoholic as a result of the conduct of federal agents on March 23, 1998 is not credible and goes against the weight of the evidence.

63.  Testimony on Plaintiff's behalf that Plaintiff has used illegal drugs as a result of the conduct of federal agents on March 23, 1998 is not credible and goes against the weight of the evidence.

64.  Plaintiff was absent from school for the entire five to six-week period his parents stood trial.  No arrangements were made for Plaintiff to receive his homework or other school assignments for that entire period he was absent.

65.  Plaintiff has not sought or received consistent psychiatric care from the time of March 23, 1998 to the present.

66.  Plaintiff's parents' legal battles interfered with Plaintiff's ability to receive consistent treatment in the months following March 23, 1998.

67.  Plaintiff has not properly dealt with the feelings, emotions or trauma he experienced as a result of his parents' convictions and the loss of his life as he understood it to exist prior to March 23, 1998.

68.  Plaintiff has not dealt realistically with his feelings towards his father in regard to his father's criminal actions.  Instead he continues to blame the police for his father's imprisonment and the problems he now faces.

69.  Plaintiff suffered no physical injuries as a result of his temporary detention on March 23, 1998.

70.  Plaintiff experienced trauma and disruption in his life as a result of his parents' criminal activities, subsequent arrests and eventual incarceration.

71.  As a consequence of Plaintiff's parents' criminal activities, Plaintiff experienced the loss of his stable, peaceable lifestyle as he perceived it prior to March 23, 1998.

72.  As a consequence of Plaintiff's parents' criminal activities, Plaintiff experienced the loss of his spacious home in Chatsworth, California.

73.  As a consequence of Plaintiff's parents' criminal activities, Plaintiff experienced the disassociation of extended family members with whom Plaintiff had been close before the criminal activities of his parents were exposed.

74.  When Plaintiff has sought treatment for his alleged psychological disorders, Plaintiff has failed to comply with the recommendations of his treating physicians, and instead has chosen to "self-medicate" with alcohol and illegal drugs.

75.  Plaintiff dropped out of school and put forth little effort, if any, to obtain a high school diploma or a GED.

76.  Even though low cost and free social programs are available to Plaintiff, he has chosen not to avail himself of any such programs for vocational rehabilitation, substance abuse or psychiatric treatment.

77.  Any Finding of Fact deemed to be a Conclusion of Law is hereby incorporated into the Conclusions of Law.

## II.

## THE COURT'S CONCLUSIONS OF LAW

1.  FTCA specifies that the liability of the United States, if any, is to be determined in accordance with the law of the place where the allegedly tortious act or omission occurred.  28 U.S.C. 1346(b).  However, in "an action under the FTCA, a court must apply the law the state courts would apply in the analogous tort action, including federal law."  Rhoden v. United States, 55 F.3d 428, 431 (9th Cir. 1995).

2.  "The elements of a battery claim in California are that (1) the defendant intentionally did an act that resulted in harmful or offensive contact with the plantiff's person, (2) the plaintiff did not consent to the contact, and (3) the contact caused injury, damage, or loss or harm to the plaintiff." Tekle v. United States, 511 F.3d 839, 855 (9th Cir. 2006).

3.  "To establish [ ] assault, Tekle would need to establish that (1) the officers threatened to touch him in a harmful or offensive manner; (2) it reasonably appeared to him that they were able to carry out the threat; (3) he did not consent to the conduct; (4) he was harmed; and (5) the officers' conduct was a substantial factor in causing the harm." Tekle, 511 F.3d at 855 (citing Judicial Council of Cal., Civil Jury Instructions No. 1301 (2006)).

4.  To prevail on his claims for assault and battery, Plaintiff must also prove that federal agents used "unreasonable force" to detain Plaintiff.  "A prima facie case for battery is not established under California law unless the plaintiff proves that an officer used unreasonable force against him to make a lawful arrest or detention." Saman v. Robbins, 173 F.3d 1150, 1157 (9th Cir. 1999) (citing Edson v. City of Anaheim, 63 Cal. App. 4th 1269, 1273 (Cal. Ct. App. 1998).  Similarly, to prevail on a claim for assault, Plaintiff must prove that federal agents used "unreasonable force" to detain Plaintiff.  See Finley v. City of Oakland, 2006 U.S. Dist. LEXIS 6623, at *40-42 (N.D. Cal. Feb. 2, 2006); Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 923 (9th Cir. 2001).  In a civil assault and battery case against law enforcement, the plaintiff bears the burden of establishing the use of unreasonable force, using an inquiry similar to that employed in cases alleging Fourth Amendment violations. Edson, 63 Cal. App. 4th at 1273; see also Saman, 173 F.3d at 1156-57, fn. 6.

5.  It is axiomatic that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Saman, 173 F.3d at 1156 (citing Graham

v. Connor, 490 U.S. 386, 396 (1989).  The reasonableness inquiry requires a court to consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97; Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir.2001) (citations omitted) ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' [sic] violates the Fourth Amendment.").

6. Plaintiff has not met his burden of showing by a preponderance of the evidence that the actions of federal agents toward Plaintiff were unreasonable under the circumstances.

7. Plaintiff has not presented any evidence that the actions of federal agents toward Plaintiff on March 23, 1998 were unreasonable from the perspective of a reasonable officer on the scene.

8. Handcuffing Plaintiff for approximately 15-20 minutes from the time Plaintiff exited the garage until the Tekle residence was secured, under the circumstances, was consistent with generally accepted law enforcement techniques and lawful, reasonable and justified from the perspective of a reasonable officer on the scene.

9. Under generally accepted law enforcement techniques, and the perspective of a reasonable officer on the scene, pointing weapons in the direction of Plaintiff when he exited the garage was, under the circumstances, lawful, reasonable and justified.

10. Additionally, under California law, one of the requisite elements Plaintiff must show to prevail on his claim for battery is that the "contact caused injury,

1   damage, or loss or harm to the plaintiff." <u>Tekle</u>, 511 F.3d at 855; <u>see also</u>

2   California Jury Instructions ("BAJI"),  No. 7.50  (9th ed., 2003).  Plaintiff has not

3   met his burden of showing by a preponderance of the evidence that federal agents'

4   conduct caused injury, damage, or loss or harm to Plaintiff.

5       11.  Similarly, in order to prevail on his claim for assault Plaintiff must prove

6   that the federal agents' conduct was a substantial factor in causing Plaintiff's

7   alleged damages.  <u>See</u> Judicial Council of California, Civil Jury Instruction

8   ("CACI"), No. 1301 (Dec. 2008).  Plaintiff has not met his burden of showing by a

9   preponderance of the evidence that federal agents' conduct was a substantial factor

10  in causing any of Plaintiff's damages.

11      12.  Plaintiff's damages, if any, were caused by factors other than being

12  temporarily detained and handcuffed by federal agents on March 23, 1998.

13      13.  To prevail on his claim for intentional infliction of emotional distress

14  ("IIED"), Plaintiff must prove by a preponderance of the evidence "'(1) extreme

15  and outrageous conduct by the defendant with the intention of causing, or reckless

16  disregard of the probability of causing, emotional distress; (2) the plaintiff's

17  suffering severe or extreme emotional distress; and (3) actual and proximate

18  causation of the emotional distress by the defendant's outrageous conduct.'" <u>Tekle</u>,

19  511 F.3d at 856 (quoting <u>Davidson v. City of Westminster</u>, 32 Cal. 3d 197, 209

20  (Cal. 1982).  "In order to be considered outrageous, the conduct 'must be so

21  extreme as to exceed all bounds of that usually tolerated in a civilized community.'"

22  <u>Davidson</u>, 32 Cal. 3d at 209 (internal citations omitted).  Additionally, "[w]hether

23  treated as an element of the prima facie case or as a matter of defense, it must also

24  appear that the defendants' conduct was unprivileged." <u>Id.</u>

25      14.  Plaintiff has not proven, by a preponderance of the evidence, that the

26  conduct of federal agents on March 23, 1998 was unreasonable, let alone

27  outrageous.

28      15.  Plaintiff has not proven, by a preponderance of the evidence, that federal

1    agents intended to cause Plaintiff any emotional distress, or that they acted with

2    reckless disregard of the probability that Plaintiff would suffer emotional distress.

3    See CACI, No. 1600 (Dec. 2008).

4        16.  Plaintiff has not met his burden of showing by a preponderance of the

5    evidence that the federal agents' conduct was the actual or proximate cause of the

6    damages he now alleges.

7        17.  Plaintiff's damages, if any, were caused by factors other than being

8    temporarily detained and handcuffed by federal agents on March 23, 1998.

9        18.  The evidence demonstrates that Special Agent Jankowski's raid plan

10   specifically intended to protect the Tekle children, including Plaintiff, from any

11   avoidable exposure to the search and arrest warrants, and that Special Agent

12   Hawkes, out of concern for Plaintiff's safety and the other agents' safety,

13   handcuffed Plaintiff and walked him away from the zone of danger.  The handcuffs

14   were removed as soon as the Tekle residence was secured, and thereafter, Plaintiff

15   was permitted to sit and watch television until relatives took him into their custody.

16   Federal agents did not spit on Plaintiff, throw shoes at his feet, make insulting

17   remarks about his parents' country of origin, or point their weapons at him while he

18   was searched, handcuffed, or supervised during his detention.

19       19.  Even assuming, *arguendo*, that the lawful actions of federal agents on

20   March 23, 1998 caused Plaintiff any emotional distress, whatsoever, such a

21   showing still is not sufficient to prevail on a claim for intentional infliction of

22   emotional distress.  See Cummings v. Farmers Ins. Exch., 202 Cal. App. 3d 1407,

23   1423 (Cal. 1988) (even though defendant's acts did cause emotional distress, such a

24   showing was not sufficient to prove intentional infliction of emotional distress).

25       20.  False imprisonment under California law requires "nonconsensual,

26   intentional confinement of a person, without lawful privilege, for an appreciable

27   length of time, however short." Rhoden v. United States, 55 F.3d 428, 430 (9th Cir.

28   1995) . Plaintiff must also show that he was actually harmed and that Federal

1   Defendant's conduct was a substantial factor in causing his harm.  CACI No. 1400

2   (Dec. 2008).  "Once the plaintiff has proven the elements of the tort, the defendant

3   has the burden to establish that the detention or arrest was legally justified."  Id.  To

4   determine whether a federal officer has lawful authority to carry out an arrest, a

5   California court asks whether the arrest by the federal officer was authorized under

6   federal law.  See Rhoden, 55 F.3d at 431; see also Galvin v. Hay, 374 F.3d 739, 758

7   (9th Cir. 2004).  It is well established that law enforcement officers may

8   temporarily detain the occupants of a residence, even if they are not suspected of

9   committing any crime, during the execution of a search warrant.  Michigan v.

10  Summers, 452 U.S. 692, 705 (1981); Muehler v. Mena, 544 U.S. 93, 97 (2005).

11  However, the detention must be conducted in a reasonable manner.  Dawson v. City

12  of Seattle, 435 F.3d 1054, 1066 (9th Cir. 2006).

13      21.  As explained above, Plaintiff has not met his burden of showing by a

14  preponderance of the evidence that the actions of federal agents toward Plaintiff

15  were unreasonable under the circumstances or unreasonable from the perspective of

16  a reasonable officer on the scene.

17      22.  Plaintiff has not met his burden of showing by a preponderance of the

18  evidence that the federal agents' conduct was a substantial factor in causing any of

19  Plaintiff's damages.

20      23.  Plaintiff's damages, if any, were substantially caused by factors other

21  than being temporarily detained and handcuffed by federal agents on March 23,

22  1998.

23      24.  Plaintiff failed to prove by a preponderance of the evidence that the

24  United States is liable for false imprisonment/arrest, assault, battery or intentional

25  infliction of emotional distress.

26      25.  Moreover, the conduct of federal agents on March 23, 1998 was justified,

27  and therefore, privileged.  Accordingly all of Plaintiff's claims fail.  The detention

28  of an individual carries no tort liability where it was otherwise privileged or

1    justified by law.  Restatement (2d) Torts, § 122-124 (1965).

2        26.  To determine whether a federal officer has lawful authority to carry out

3    an arrest, a California court asks whether the arrest by the federal officer was

4    authorized under federal law.  See Rhoden, 55 F.3d at 431; see also Galvin, 374

5    F.3d at 758.  It is well established that law enforcement officers may temporarily

6    detain the occupants of a residence, even if they are not suspected of committing

7    any crime, during the execution of a search warrant.  Michigan v. Summers, 452

8    U.S. 692, 705 (1981).

9        27.  On March 23, 1998, federal agents possessed lawful authority to execute

10   and serve valid search and arrest warrants at the Tekle residence.  See 26 U.S.C. §

11   7608.

12       28.  During the execution of the search warrant, federal agents possessed

13   lawful authority to temporarily detain the occupants of the Tekle residence,

14   including Plaintiff, even if he was not suspected of committing any crime.

15   Summers, 452 U.S. at 705.

16       29.  The conduct of federal agents on March 23, 1998 in detaining Plaintiff

17   was consistent with generally accepted law enforcement techniques, and was lawful

18   from the perspective of a reasonable officer on the scene.  Saman, 173 F.3d at 1156.

19

20       30.  On March 23, 1998, federal agents possessed a good-faith belief that

21   they had a legal right to engage in their conduct towards Plaintiff.  Consistent with

22   Special Agent Hawkes' training, and in consideration of the legitimate law

23   enforcement interests at issue – for example, "preventing flight in the event that

24   incriminating evidence is found," "minimizing the risk of harm to the officers," and

25   facilitating "the orderly completion of the search" – handcuffing Plaintiff for the

26   15-20 minute period until the Tekle residence was secured was lawful, reasonable,

27   justified, and therefore privileged.  Summers, 452 U.S. at 702-703.

28       31.  On March 23, 1998, the governmental interest in not only detaining

Plaintiff, but using handcuffs, were at their maximum when the warrants authorized (1) the search and arrest of a suspected narcotics trafficker; and (2) the search of the Tekle residence for weapons, drugs, and any other evidence of a narcotics trafficking enterprise.  See, e.g., Muehler, 544 U.S. at 100 (stating that governmental interests in detaining and using handcuffs were at their maximum where the search warrant authorized a search for weapons and a wanted gang member resided on the premises); Summers, 452 U.S. at 702-703 (recognizing the execution of a warrant to search for drugs "may give rise to sudden violence or frantic efforts to conceal or destroy evidence").  Accordingly, the federal agents' conduct was justified under the circumstances, and therefore privileged.

32.  The conduct of federal agents on March 23, 1998 was privileged even under California law.  Under California law, law enforcement officers are entitled to use reasonable force to effectuate an arrest or detention, even a temporary detention.  See Cal. Penal Code § 835; People v. Rivera, 8 Cal. App. 4th 1000, 1008 (Cal. Ct. App. 1992) ("case law teaches that physical restraint does not convert a detention into an arrest if the restraint is reasonable under the circumstances").  See also CACI No. 1605 (Dec. 2008) (Defendant is not liable for IIED if (1) the federal agents were exercising their legal right to detain Plaintiff; (2) their conduct was lawful and consistent with community standards; and (3) they had a good faith belief that they had a legal right to engage in the conduct.)

33.  The conduct of federal agents on March 23, 1998 was reasonable under the circumstances.  Accordingly, Plaintiff's FTCA claims are privileged under California law.

34.  The availability of law enforcement privileges was not abrogated or eliminated in United States v. Olson, 546 U.S. 43 (2005).   This interpretation is consistent with axiomatic principles of statutory construction.  See United States v. Tatoyan, 474 F.3d 1174, 1181 (9th Cir. 2007) ("Statutes should be read to avoid ... absurd results."); California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v.

United States, 215 F.3d 1005, 1012 (9th Cir. 2000) ("[I]t is a well established axiom of statutory construction that, whenever possible, a court should interpret two seemingly inconsistent statutes to avoid a potential conflict.").

35.  When Congress expressly permitted tort claims under the FTCA with respect to actions of federal law enforcement officials, Congress also could have waived federal law enforcement privileges at the same time, but it did not.  28 U.S.C. § 2680(h).  Indeed, as previously held by the Ninth Circuit, section 2680(h) was intended to provide remedies for victims of law enforcement *abuses*, not for the routine and lawful exercise of law enforcement privileges.  Orsay v. United States Dep't of Justice, 289 F.3d 1125, 1134-35 (9th Cir. 2002).

36.  Any Conclusion of Law deemed to be a Finding of Fact is hereby incorporated into the Findings of Fact.

**IT IS SO ORDERED.**

/ s /

_____

**HONORABLE RONALD S.W. LEW**

Senior, U.S. District Court Judge

DATED: May 8, 2009